## Mercersburg College, Appellant, *v.* Poffenberger.

*Taxation—Exemption—Charity—School—Income from students—Surplus income.*

If the surplus income of a school over cost of maintenance is derived from payments made by students, the institution cannot be said to be maintained by public or private charity, even though the surplus be used to enlarge the institution by the purchase of additional lands and the erection of additional buildings—particularly if it be not shown that without such enlargement the institution could not be maintained.

A school will not be deemed to be a purely public charity, although it gives free tuition to a certain number of students, where it appears that the sums paid by students were sufficient not only to pay the annual expenses of maintenance, but to yield a surplus of about $9,000 per annum for five years, and that this surplus was not used to increase the number of free scholars, or to reduce tuition fees in the future, but to the extension and improvement of the grounds, buildings and equipment, and the augmentation of its facilities and efficiency as an educational institution.

If the income derived from students' charges alone exceeds the amount necessary to maintain the institution, the lands and buildings are not exempt from taxation; and in determining whether there is a surplus over the cost of maintenance, the rental value of the lands and buildings are not to be included in the cost of maintenance.

Argued Oct. 22, 1907.  Appeal, No. 184, Oct. T., 1907, by plaintiff, from decree of C. P. Franklin Co., Equity Docket 3, page 24, dismissing bill in equity in case of The Regents of the Mercersburg College v. Jacob U. Poffenberger, collector of taxes.  Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.  Affirmed.

Bill in equity for an injunction.

ENDLICH, J., specially presiding, filed the following opinion:

This bill is filed for the purpose of obtaining a decree (1) declaring Mercersburg College to be an institution of purely public charity, and a college founded, endowed and maintained by private charity, and its property, with some few admitted exceptions, to be exempt from taxation for county, borough and school purposes, and (2) enjoining the collection of such taxes assessed against the whole of its property during the years 1905 and 1906.  The answer denies the character claimed for the institution in the bill, as well as the necessity of much of the property for occupancy and enjoyment by its lawful purposes, and asserts the liability of the whole of it to local taxation.  The cause was tried, and upon conclusion of the testimony argued, on December 1, 1906.  There seems to be no ground for dispute about the facts.

### FINDINGS OF FACT.

1. By a decree of this court, of October 30, 1865, a corporation was erected on the basis of certain articles thereby approved as its charter, providing for the establishment of "a college for the education of youth in the learned languages, the arts, sciences and useful literature . . . . called and known by the name of the Mercersburg College . . . . under the management, direction and government of" nine regents, named, who were to "continue to exercise their trust until their successors shall be duly elected," and who with their successors were "declared to be a body politic and corporate . . . . by the name, style and title of The Regents of the Mercersburg College."  A further decree of this court, of June 20, 1894, increased the number of the regents to fifteen,

of whom nine were to be elected by the Synod of the Potomac of the Reformed Church of the United States and six by the board of regents. The plaintiffs are the corporation thus erected and existing in due succession to its original organization under said decrees.

2. The powers conferred upon them by their charter are, besides those essentially incident to all corporations, and those specifically involved in the management and operation of a college with its usual incidents, the powers "for the use of said college" to acquire and hold real and personal property and dispose of or invest the same, and for the purchase of real estate, repair of existing and erection of new buildings for the general purposes of the institution, to issue stock redeemable or perpetual on such terms as they may deem fit, and procure money in such manner and to such amount as they may think expedient.

3. The college was founded by charitable bequests and gifts of individuals. It has been all along and still is the recipient of such, and may reasonably expect to be aided thereby in the realization of projects of development already on foot. Until within recent years it was almost entirely supported, as a small and sickly institution, by voluntary contributions. During the past twelve years, under the guidance of a most competent principal, it has developed into a large and prosperous school, whose revenues from the sums paid by students for tuition, etc., now not only maintain it, but yield a surplus over and above the cost of maintenance, that surplus averaging for the past five years about $9,000 per annum.

4. In addition to the income from charges for tuition, etc., the plaintiffs derive a revenue from certain portions of the land (about thirty-five acres, worth from $100 to $150 per acre), acquired by them for the future uses of the college, necessary to be controlled by it with a view to its enlargement, but presently cultivated as farming land; also from a building outside of the college grounds occupied by and virtually leased to an employee of the institution, its rental value being $50.00 or $60.00 per year; and, finally, from certain old buildings known as the Preparatory School and Diagnothean Hall, for-

merly used as dormitories in connection with the college, but now unused by it and at times wholly or partially rented.

5. A tract of about eleven acres -is cultivated by plaintiffs as a truck patch, the produce being consumed in the school, except an occasional trifling excess over its needs, which is sold. Upon this tract is a pig-pen in which a quantity of pigs are fattened with the offal from the college kitchen and table. From this economy plaintiffs realize about $500 a year.

6. In Main Hall is kept and operated a store under plaintiffs' direction in such manner as to pay for itself and yield a profit of from $2,000 to $3,000 a year. The store is for the accommodation of, and patronized by, not the general public, but the students; is indispensable as well for their convenience as for the proper discipline of the institution, and pays no rent to the plaintiffs. Its profits go to the maintenance of the athletic enterprises of the students, which, if not thus paid for, would have to be either abandoned or provided for by contributions from or assessments upon the students. Plaintiffs derive no revenue from the store.

7. The entire income of the college over and above what is needed to defray the expenses of its maintenance goes into the betterment of the school, the extension and improvement of its grounds, buildings and equipment, and the augmentation of its facilities and efficiency as an educational institution. None of the regents derive any profit from it whatever. Their service is gratuitous. No stock has ever been issued. No individual has, as a member of the corporation, realized any pecuniary advantage by the increase in the extent or value of the property or by the income derived from its successful management.

8. Within the constantly expanding limits of the accommodations afforded, the college is open to all white male students of suitable age and character, without distinction of class or creed. No particular religious or denominational beliefs are enforced; nor is any sectarian test applied in the employment of instructors. The regular annual charge for resident students in 1901 and 1902 was $330, and is now $375 (with an additional charge for breakage, etc., of $5.00, contingently returnable).

Sons of ministers intending to study for the ministry are charged $250. A similar reduction is made in cases of sons of officers of the army and navy. Poor students, willing to render certain services in the institution, are received at the rate of $150—a reduction greatly in excess of the market value of the services exacted. And there are yearly, on an average, two poor students who render no services and pay nothing at all. The minimum charge for separate rooms in 1901 and 1902 was $30.00 and is now $40.00, running all the way up to $150. Day scholars are charged $50.00 for tuition. The college has at present 371 students, of whom over ninety enjoy reduced rates. The regular charge of $375 (or $380) is very much below the average charges made by other institutions of similar standing and facilities.

9. The real estate owned by the plaintiffs, and lying partly within the limits of the borough of Mercersburg and partly in Montgomery township, comprises about eighty-three acres, including four acres leased to them by the Synod of the Potomac for ninety-nine years, and a small vacant lot. They also hold under lease (with the intention and for the most part with options to purchase) thirty-nine and one-half acres. With the exception of said vacant lot and the properties referred to in the fourth finding of fact, all the property held by plaintiffs is occupied by and necessary for the purposes of the college.

10. The total amount (representing voluntary contributions, surplus revenues and a remaining indebtedness of $50,000) expended since 1893 in acquiring and improving the property, etc., of the college exceeds $175,000, which includes $20,000 spent in enlarging and bettering the buildings upon the tract held under the lease from the Synod of the Potomac.

11. The rental value of the entire property is such that, if it be added to the expense of maintaining the college, the total would more than wipe out the clearings of any year.

12. For the year 1905 the county of Franklin levied and assessed a county tax upon the real estate of plaintiffs and two horses and five head of cattle owned by them, amounting to $479.22, and for the year 1906, a similar tax on the same property, amounting to $479.50.

13. For the year 1905 the borough of Mercersburg levied and assessed a borough tax upon so much of said property as lies within its limits, amounting to $539.75.

14. For the year 1905 the Independent School District of Mercersburg levied and assessed a school tax upon so much of said property as lies within its limits, amounting to $541.25.

15. Notice of these several assessments was given to plaintiffs, who did not appeal therefrom.

16. The duplicates for the collection of the county tax for 1905 were placed in the hands of the defendant, Abram Carbaugh, and those for the collection of the borough and school taxes in the hands of the defendant, Jacob U. Poffenberger— they being respectively the proper persons for the purpose.

17. The plaintiffs admit their liability to taxation upon those portions of their property mentioned in the fourth, and the vacant lot mentioned in the ninth finding of fact; but upon demands made for payment of the gross sums of the several above taxes assessed upon the entire property for the year 1905, refused to pay the same and instituted this proceeding to restrain their collection, as well as any further steps towards collecting the county tax assessed for the year 1906.

### DISCUSSION

The bare statement of the foregoing facts carries with it a commendation of the institution here involved, as well as of the devotion, the wisdom and the energy of its management. Unfortunately, under the adjudicated cases, it also decides adversely to the plaintiffs' contention the question of their rights to exemption from local taxation as regards the whole or any part of their property.

That we are dealing with an institution in its inception and practical workings partaking of many important characteristics of a public charity cannot be doubted. It was founded by charity. Its original and much of its subsequently acquired property was contributed by charity. It continues to be the recipient of charitable donations. It is open to the public generally. It receives all whom it receives at rates far below those obtaining in other schools of similar rank, many at a still

further reduced and some wholly without charge. In the nature of things it cannot admit everybody. But so long as the line is drawn by distinctions which involuntarily affect or may affect any of the whole people (e. g., youth, age, sex, infirmities, etc.), it does not destroy the public character of the institution, although but a small number may be directly benefited: Philadelphia v. Masonic Home, 160 Pa. 572. Neither, as sufficiently appears by Episcopal Academy v. Philadelphia, 150 Pa. 565; White v. Smith, 189 Pa. 222, and Haverford College v. Rhoads, 6 Pa. Superior Ct. 71, is that character impaired by the preponderance of representatives of a certain denomination in the management or by a discrimination between students with respect to charges for tuition, etc., based upon their parentage or their ability to pay. Again, there is in the relation of plaintiffs to the institution committed to their care no element of gain or profit to them individually. Their charter expressly designates that relation as one of "trust," and circumscribes the power conferred upon them to receive, handle, increase and dispose of property by the words "for the use of said college," while limiting that of issuing stock and borrowing money to the purchase and improvement of real estate "for the general purposes of the institution." So far as the persons constituting the corporation are concerned, in the absence of any stock issue giving the holders an interest in any part of the property or a right to dividends payable out of profits made by its use, the language of the present chief justice in Donohugh's App., 86 Pa. 306, at p. 341, is very much in point:

"The library is a trust, and while it is the property of the corporation, and therefore in a certain sense of the corporate stockholders, yet it is not their property in any full, legal or commercial sense. They cannot sell it and divide the proceeds among themselves as individuals—that would be a violation of the trust, which a court of equity would be bound at once to restrain."

At the same time it must be conceded that there is in the organic law of this corporation the same lack that was deemed significant in Thiel College v. Mercer County, 101 Pa. 530, and Miller's Appeals, 10 W. N. C. 168 (see Philadelphia v. Women's

Christian Ass'n, 125 Pa. 572, 580), of any provision stamping it as a charity, pure and simple, and its property as devoted to such charity to the exclusion of private or corporate gain—of any provision preventing the institution from being ever turned entirely into a money-making concern, or permanently enjoining upon it the retention in its operation of any of the benevolent features above instanced as presently incident to the same. If, therefore, the declared object of the corporation, so greatly emphasized in Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, rather than its practical work, is to be looked upon as a test of its charitable character, there is no comfort in the application of such a test here. But apart from this consideration, it must be remembered that it is not every charity even of a public nature that is entitled to hold its property free from local taxation. The constitution exempts nothing, but in art. IX, sec. 1, gives the legislature the restricted power of granting exemption to certain classes of property, among which the only one capable of embracing the plaintiffs' property is that of "institutions of purely public charity," leaving it to the legislature to say what subjects within the meaning of the constitutional language, to be declared by the courts as the ultimate interpreters of the constitution, the privilege contemplated by it is to be extended. The legislature by the Act of May 14, 1874, P. L. 158, has ordained in detail what is to be exempt from local taxation. The claimant of exemption is bound to bring itself clearly within this enumeration: Philadelphia v. Barber, 160 Pa. 123, 126. The item of it here invoked is:

"All . . . . colleges . . . . and institutions of learning . . . . with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity."

Of course, this enactment is to be read in the light of the constitutional restriction upon exemptions to institutions of purely public charity, and to be construed so as to conform to, and not to violate it. The idea of a purely public charity implies that all the benefit resulting from the management and use of the property held for its purposes goes to the public: Episcopal Academy

v. Philadelphia, 150 Pa. 565, 573. It is inconsistent with the withholding from the public of any part of what is contributed by it, in the shape of donations for maintenance, of earnings, or of income from lands or invested funds. Under the statute the criterion of exemption of institutions of learning is to be sought in the words "founded, endowed and maintained by . . . . charity." In applying that criterion it must be so understood as to make it in truth the equivalent of the constitutional test. That does not mean that in order to be within the exemption the institution must be one devoted to pauperizing the public by casting its benefits gratuitously upon those able as well as upon those unable to pay in money or in work. It is settled that the purely public character of a charity is not destroyed if to some extent it derives a revenue from the recipients of its bounty. It is only essential to the preservation of that character that, where its operations are in part carried on upon the footing of business dealings, by exacting a return for what is given, they be as a whole free from any element of corporate as well as private gain: Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, 582; Haverford College v. Rhoads, 6 Pa. Superior Ct. 71. This principle was applied in Episcopal Academy v. Philadelphia, supra, with the effect of holding entitled to exemption under the act of 1874 a school founded and endowed by charity, and managed with a view to furnishing educational advantages at a minimum cost and as far as possible gratuitously, but deriving a revenue from tuition fees sufficient to keep it in operation, constantly increasing the number of free scholarships. But it was distinctly stated that had the revenues gone beyond the line of self-support, it would not have been exempt. Of this decision it was declared in Sunday School Union v. Philadelphia, 161 Pa. 307, and in White v. Smith, 189 Pa. 222, that it went to the uttermost limit of liberality in the construction of the constitution and of the statute, and is to be accepted as authority only upon a state of facts identical with that there passed upon. It is to be noted also that the contrary decision in the same case when first before the Supreme Court upon appeal from a preliminary injunction, Hunter's App., 22 W. N. C. 361, 1 Mona. 1, has

been referred to with approval by the same court, before the decision in 150 Pa. 565, in Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, 580–581, and since in Philadelphia v. Overseers, 170 Pa. 257, 265; White v. Smith, 189 Pa. 222, 229. In view of all this it is declared in Harrisburg v. Harrisburg Academy, 26 Pa. Superior Ct. 252, that the doctrine of the Episcopal Academy case "is not to be extended one jot further," that doctrine being, in Pocono Pines Ass'y v. Monroe County, 29 Pa. Superior Ct. 36, 45, again stated as going no farther than this, that an institution of learning, which in its nature and purposes is a purely public charity, does not lose its character as such under the tax laws if it receives a revenue from tuition fees sufficient to keep it in operation. Accordingly, in the case of Harrisburg v. Academy, 26 Pa. Superior Ct. 252, a school originally founded with state aid, for a long time supported by voluntary donations, but for a series of years self-sustaining from tuition fees based upon "actual cost, including instructors' salaries, light, heat, repairs and insurance," and deriving, besides, an annual revenue of $150 from the renting to the principal of the school of a house upon its grounds as a residence, was because of this circumstance held not to be exempt.

There seems to be nothing at all in the facts of the plaintiffs' case which can be laid hold of to take it out of the rule thus authoritatively prescribed. The fact that the charges for tuition, etc., are lower than in other similar schools, and are in part or wholly remitted in certain cases, is not at all decisive. See Thiel College v. Mercer County, 101 Pa. 530; Philadelphia v. Overseers, 170 Pa. 257; Miller's Appeals, 10 W. N. C. 168; Harrisburg v. Harrisburg Academy, 26 Pa. Superior Ct. 252. It is not claimed, as it was in the last-named case and shown in Episcopal Academy v. Philadelphia, 150 Pa. 565, that the charges made represented but the actual cost of what was given in exchange. Instead of going down with the increase of revenues, the charges at the Mercersburg College have gone up, and there has been no proportionate increase in the number of students received gratuitously. For some years past its income from charges for tuition, etc., has been sufficient, not

only to meet the actual current expenses of its maintenance, but to yield a substantial annual surplus over and above the same; and in addition thereto, it derives a revenue from the cultivation as a farm of part of the land and the rental of buildings belonging to it. It is true that it is also in receipt of voluntary donations. But it is idle to talk of a school as "maintained" by such, where its income from its students is employed and exceeds what is needed for that purpose. It is also true that this excess goes into the extension and improvement of the property and the enhancement of the facilities of the school. Yet it is revenue derived from the use of the property donated by charity. It is money gathered from the public not by way of charity, but in exchange for benefits conferred upon it in the line of the purposes for which the institution was created and endowed. It represents payments made by the public for those benefits over and above their cost to the college. In every aspect it is money contributed by the public. Being retained by the corporation it is something contributed by the public and withheld from it. Granted that, by reason of the use of the surplus in enlarging the capacity, the conveniences and the efficiency of the school, the public will in turn derive a benefit from it; still, whatever that may be, it can only be the issue of what has come from the public, the corpus being held by the corporation as its own. In a word, a surplus thus derived is, no matter how invested or employed, corporate profit; and hence in Harrisburg v. Academy, 26 Pa. Superior Ct. 252, it was said at p. 262, referring to the $150 revenue over expenses met by tuition fees:

"To what purpose this was devoted does not appear, nor is it material to the decision of this case that we should know, in view of the admission that the revenue derived from other sources made the institution self-sustaining."

In determining whether there is a surplus over the cost of maintenance it will not do to include in the latter the rental value of the property devoted to the purposes of the institution. According to the legal definition of rental value it necessarily means the value of the use of property for any purpose to which it is adapted: Nelson v. Ry. Co., 41 Minn. 131 (42 N. W. Repr.

788). It would be a curious system that would grant or deny to an institution enjoying a surplus of revenues immunity from taxation in proportion to the increase or decrease in the value of the property out of the use of which that revenue is made. An institution largely endowed with property in an appreciating locality would be privileged to increase its corporate profits from year to year practically without limit, and yet remain a purely public charity. Another, doing exactly the same things and making exactly the same surplus over expenses would lose that character because its property was worth less in the market. There is nothing in the decision in Philadelphia v. Penna. Hospital, 154 Pa. 9, at p. 11, carefully read, which sustains any such theory. One building of a number comprised in the establishment was used for the reception of patients paying high rates. Treated as something apart from the rest of the institution, this building yielded a considerable profit over the expense immediately incident to its maintenance. Comparing, however, the expense of the whole institution with its income as a whole, the latter, including the revenue from the building referred to, was just about equal from year to year to the actual cost, without considering the value of the property (over $1,000,000) as at all entering into the computation. The point of the decision is that a purely public charity does not lose its status as such because of a profit derived from an integral part of the establishment and going into its general revenue devoted to the purposes of its creation and as a whole not exceeding the actual cost of its maintenance—a doctrine reaffirmed in Penna. Hospital v. Delaware County, 169 Pa. 305, and in entire accord with the strictest definition of a purely public charity. It is not unlikely that the word "after," in the next to the last paragraph of the per curiam opinion in Philadelphia v. Penna. Hospital, 154 Pa. 9, at p. 11, ought to be regarded as but a slip of the pen, or a misprint, for "without;" for throughout the case, and in the preceding paragraph the fact of the exclusion of the rental value as an element of cost is emphasized. But even standing as it does, the decision does not profess and is not effective to sanction the inclusion, in the estimate of the cost of maintenance as compared with

revenue, of the rental value of the property occupied. It was cited by counsel for defendants in Philadelphia v. Overseers, 170 Pa. 257, as so deciding; but this view of its effect failed to secure even a passing notice in the elaborate opinion rendered by Mr. Justice DEAN. It is very plain that, the question being one of comparison between corporate income and corporate expenditure, the rental value of the property is no part of the latter. Where the property has been donated for the benefit of the public the corporation holding the legal title is but the vehicle of that benefit. The rental value of the property is a gift to the public and belongs to it. In so far as the property may have been acquired by the corporation with profits realized and retained by it, the very assertion that, in estimating the profits of any year the annual value of the profits of other years invested in the property is to be deducted, is its own sufficient refutation. Indeed, the inadmissibility of the proposition under discussion is one of those things which are, in the language of KEITH, P., in Smoot v. L. & B. Assn. (Va.), 29 S. E. Repr. 746, "so clear that the attempt to elucidate them serves rather to obscure." It is, however, in addition settled by express authority. In Harrisburg v. Academy, supra, it seems to have been urged that the rental value of the property should be considered in determining whether the revenues exceeded the cost of maintenance. RICE, P. J., delivering the opinion of the court, rejects the contention, saying, at p. 262:

"There is no warrant for holding that that is the test by which to determine whether an institution, founded and endowed by public or private charity, is or is not self-sustaining within the meaning of the decisions."

Equally irrelevant is the fact that the college owes a debt of $50,000 incurred in the enlargement and improvement of its property. It has the equivalent in property and equipment, i. e., in the means of realizing increased profits, out of which to pay the interest upon the debt and eventually the debt itself. Under the circumstance, the incurring of the indebtedness was in truth but the anticipation of future profits. The question whether the debt can be set off against the yearly

surplus until the former shall be extinguished by the accumulations of the latter thus comes back to the question already discussed, whether the fact that profits realized are devoted to the increase and betterment of the property employed for the purposes of the institution makes them anything else than corporate profits?  It may be pertinent to note that the property held subject to taxation in Philadelphia v. Overseers, 170 Pa. 257, had been (see p. 260) to a considerable extent purchased with surplus income and money borrowed on mortgage. In Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, it was agreed that the property acquired by the association for $70,000 was subject to a debt of $36,000 borrowed to pay for the excess of its cost over what had been contributed by charity towards its purchase.  Yet the fact of even this original indebtedness, though mentioned, cut no figure in the decision.

The, conclusion, however, reluctantly arrived at seems to be inevitable, that for a considerable period the Mercersburg College must be deemed as having made, by reason of its revenue from the charges for tuition, etc., an annual profit, within the meaning of the decisions, and that during that period it has been and presently is in no proper sense maintained by charity.  It is not even dependent upon, though it looks for the further aid of, charity for the carrying out of its ambitious and praiseworthy program of future extensions and betterments.  In a word, it is not a purely public charity free from the element of corporate gain, with which exemption from taxation does not, under our law, consist.  And inasmuch as this corporate gain is the result of the conduct of the establishment as a whole, it subjects the whole of it to taxation. This is not the case of a charitable institution deriving a revenue from some distinct item of property owned by it or some divisible portion of the same, and therefore taxable only in respect to it, as in Philadelphia v. Barber, 160 Pa. 123; Sunday School Union v. Philadelphia, 161 Pa. 307; Pocono Pines Ass'y v. Monroe Co., 29 Pa. Superior Ct. 36.  The question here is of liability to or exemption from taxation of the entire property of the plaintiffs.  No distinction need, therefore, be made between the bulk of it and the items referred to in the

fourth and the vacant lot mentioned in the ninth finding. Nor, finally, is it a just, though perhaps a ready, criticism of the law to say that it puts a premium upon nonsuccess and a penalty upon judicious and enterprising management. Failure to earn expenses does not ·make a school a public charity: Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, 581, per PAXSON, C. J. No more, as has been seen, does a school founded and endowed as· a charity lose its character as such by proving its ability to earn its way. But when it has reached and is about to pass that point it has the choice of two courses. It may keep its income down to its expenses by reducing its charges for tuition, etc., or increasing the number of its free scholarships, as in Episcopal Academy v. Philadelphia, 150 Pa. 565, trusting to future charitable gifts for an enlargement of its capacity. Or it may go on, as here, increasing its revenues beyond its expenses and adding to its permanent property from the surplus of its own earnings as well as from such donations as may come its way. In the one case the number of its beneficiaries will probably continue more restricted. But the benefit conferred upon each individual will be greater, and the charity will remain a purely public one, exempt as such from taxation. In the other case the institution will be enabled to reach out farther and whilst perhaps bestowing less direct charity will expand the sphere of its influence and usefulness. But it will do so not upon the footing of purely public charity, but partly of commercial business and resulting corporate profit, thereby voluntarily abandoning its claim to exemption. Which of these alternatives to choose is a practical question. If the latter is chosen, it must be because its larger promises outweigh the comparatively trifling advantages of immunity from local taxation. The liability to taxation, however, follows, not upon success; for there may be successful management within the lines of purely public charity, but upon success directed into some form of corporate emolument, as distinguished from the transmission to the· public, unabridged, of the whole fruits of private benevolence. And it follows, not as a penalty in any sense, but as a duty incident to the situation the institution has itself created, identical with

that of all others engaged in like enterprises, and as much a duty as it is a duty to pay debts: Com. v. Duffield, 12 Pa. 277, 281.

### CONCLUSIONS.

(a) The plaintiff corporation is not entitled to a decree declaring it to be presently or to have been at the time of the assessments in its bill complained of an institution of purely public charity, or a college founded, endowed and maintained by private charity.

(b) The property held by the plaintiff corporation and assessed for county, borough and school taxes as found in the foregoing findings of fact was liable to such taxation and was lawfully assessed therefor.

(c) The plaintiff corporation is not entitled to the injunction or other relief prayed for in its bill.

(d) The bill is to be dismissed with costs.

And now, January 10, 1907, it is ordered that the prothonotary enter a decree nisi in accordance with the foregoing decision, viz. : that plaintiffs' bill be dismissed with costs, and that he forthwith give notice thereof to the parties to this suit or their counsel of record, sec. reg.

On exceptions, ENDLICH, J., filed the following opinion:

All the exceptions taken in this case hinge upon the first one. The position there insisted upon was discussed in the decision on file in the light of all the then adjudicated cases bearing upon it and of full arguments of counsel. No additional cases seem to have been reported and no new views are suggested to modify the conclusion arrived at. A careful reconsideration of it has disclosed no avenue of escape from it. Nor is there any necessity for re-discussing the matter. It may, however, not be improper to add to what has heretofore been said that in no legal or popular sense can the expansion and betterment of the institution in question, the acquisition of additional grounds, erection of new and enlargement of old buildings, and the like, be treated as entering into the cost of its "maintenance." In Moon v. Durden, 2 Exch. 22, 30,

PLATT, B., says that "the verb 'to maintain' .... signifies to support what is already brought into existence." In Barber Asph. Pav. Co. v. Hezel, 155 Mo. 391 (56 S. W. Repr. 449), it is declared that it does not mean to provide or construct, but to keep up, to keep from change or decay, to preserve, to hold or keep in any particular state or condition. With this all the lexicographers agree. And in Warren Hospital for the Insane, 3 Pa. Dist. Rep. 223, 15 Pa. C. C. Rep. 83, Mr. Attorney General Hensel, adopting accepted dictionary definitions, declines to expand the term "maintenance" in a statute making an appropriation into "enlargement, addition, improvement or construction. Much less can it be permissible to do so in the case of a statute enacting exemptions from taxation: Academy of Fine Arts v. Philadelphia County, 22 Pa. 496; Com. v. Lackawanna Iron & Coal Co., 129 Pa. 346, 356.

And now, August 27, 1907, this cause came on to be heard upon exceptions filed by plaintiffs to the decision thereof filed January 10, 1907, and was argued by counsel, and thereupon, upon consideration thereof it is ordered, adjudged and decreed (1) that the said exceptions be dismissed, and (2) that the plaintiffs' bill be dismissed with costs.

*Error assigned* was decree dismissing the bill.

*O. C. Bowers*, with him *Bonbrake & Zacharias* and *Walter & Gillan*, for appellants, cited: Episcopal Academy v. Phila., 150 Pa. 572; Donohugh's App., 86 Pa. 306; Fire Ins. Patrol v. Boyd, 120 Pa. 624; Phila. v. Women's Ass'n, 125 Pa. 572; Phila. v. Penna. Hospital for the Insane, 154 Pa. 9; Phila. v. Jewish Hospital, 148 Pa. 454; Burd Orphan Asylum v. School District, 90 Pa. 21; Harrisburg v. Harrisburg Academy, 26 Pa. Superior Ct. 252; Phila. v. Barber, 160 Pa. 123; Pocono Pines Assembly, etc. v. Monroe County, 29 Pa. Superior Ct. 36.

*M. W. Jacobs*, with him *T. Z. Minehart* and *George A. Kyner*, for appellees.

OPINION BY RICE, P. J., April 20, 1908:

The general question involved in this case is whether this institution of learning is "a purely public charity," within the meaning of the constitution, which was "founded and endowed," and during the period of taxation covered by the suit, was "maintained, by public or private charity," within the meaning of the statute. The principal decisions of the Supreme Court pertinent to the branch of the subject to which the arguments of counsel have been particularly directed, have been reviewed by this court in Harrisburg v. Harrisburg Academy, 26 Pa. Superior Ct. 252, and Pocono Pines Assembly, etc. v. Monroe County, 29 Pa. Superior Ct. 36, and in the able opinions filed by Judge ENDLICH in the present case. We will not go over the entire ground again; in view of his discussion of the subject we may safely start with the case of Episcopal Academy v. Philadelphia, 150 Pa. 565. Indeed, we need not go outside of that case, for none, either before or since, has gone farther in the direction of holding the exemption to apply to an institution of learning which is supported by the fees received from students. That case decides that an institution that is in its nature and purpose a purely public charity does not lose its character as such under the tax laws, if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. We quote from the opinion: "In the case before us the donors parted absolutely with what they gave. It was devoted to a charitable use and the title placed in the trustees. The trustees have invested it in a plant adapted to the purposes of the trust. By the use of this plant they are enabled to conduct a school that gives educational advantages to some free, and at a low cost to all, and thus make the charity pay the expenses of its own administration." Grant that all this may be said of the institution in question—although it is worthy of notice that the number of free scholars compared with the number of those who pay is very small—the parallel between the two cases ceases when it is shown that the sums paid by students have been sufficient, not only to pay the annual expenses of maintaining the institution, but to yield a surplus which for the past five years has averaged about $9,000 per annum.

How, then, can it be said in this case as it was in that, that it is a charity, conducted with a view to furnish education "at its actual cost" to a great number of youths who otherwise might be required to pay more for it or forego it altogether? Observe further that this is not a case where there has been an occasional annual surplus, but more often an annual deficit, as in Philadelphia v. Pennsylvania Hospital, 154 Pa. 9, but a case where, for a long period of years, there has been uniformly a considerable surplus. If it were a private school, it would be appropriate to speak of it as a profitable educational enterprise. It is contended, however, that the mere fact that there has been and is likely to continue to be such annual surplus over the cost of the education furnished does not distinguish the case from the Episcopal Academy case. True, the report of that case shows that all receipts from students and income from property given to or purchased by the corporation, after paying expenses, were applied to increasing the number of free scholars, but it does not appear that there was a surplus over cost of maintenance derived from student charges alone. Again, the surplus so derived in the present case was not so applied as to increase the number of free scholars, or to reduce tuition fees in the future; on the contrary, to quote from Judge ENDLICH's opinion, "Instead of going down with the increase of revenues, the charges at the Mercersburg College have gone up, and there has been no proportionate increase in the number of students received gratuitously." But it is said that this distinction is not substantial, because the surplus thus derived from the sums paid by students goes into the betterment of the school, the extension and improvement of its grounds, buildings and equipment, and the augumentation of its facilities and efficiency as an educational institution. This, say counsel, is as truly and effectually "in furtherance of the education of youth" as is the reduction of tuition fees and the increase of the number of free scholars, and therefore the case is within the doctrine of that part of the opinion in the Episcopal Academy case in which Justice WILLIAMS says, that "so long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of

tuition fees or the increase of the number of free scholars, in furtherance of the education of youth, the corpus of the trust, the schoolhouse, is entitled to exemption." This remark, even considered apart from the context, is not tantamount to deciding that if what otherwise would be profit be, applied in furtherance of the education of youth, no matter in what form, the corpus of the trust, the schoolhouse, is exempt from taxation; nor is it equivalent to saying that, although the tuition fees and other student charges are so regulated as to maintain the school and to create a surplus, the land and buildings are exempt, provided the surplus is applied to the acquirement of other lands and buildings for the accommodation of an increased number of students, with the probable result, if not purpose, of increasing such surplus or profit in future years. But the above quoted remark is not to be considered apart from the context, in which, after referring to earlier cases, the court said: "We are now disposed to go further, and say that an institution that is in its nature and purposes a purely public charity does not lose its character as such under the tax laws if it receives a revenue from the recipients of its bounty sufficient to keep it in operation." But the court immediately added, evidently having in view revenue from the last mentioned source: "It must not go beyond self-support." If the tuition fees and other student charges are so regulated as to produce a profit, is that not going beyond self-support? It is impossible for us to show by any satisfactory reasoning that it is not. Again, looking to the decree for the point actually decided, we find that the matter decreed was that the defendant's real estate, used exclusively for school purposes, " is exempt from taxation under the provisions of the Act of May 14, 1874, P. L. 158, so long as no income is derived from it by the contributors or by the corporation other than that necessary to make the charity self-sustaining." This seems to imply that if in the future the income derived from student charges alone should exceed the amount necessary to maintain the institution, the lands and buildings would not be exempt. That this is the interpretation which the Supreme Court has placed upon the decision is shown by the following quotation from the

opinion of Mr. Justice DEAN in American Sunday School Union v. Philadelphia, 161 Pa. 307, at page 316: "In the case of the Episcopal Academy v. Philadelphia, 150 Pa. 565, this court went to the outside limit of liberality in construction of the constitution. The school was founded and endowed by public and private charity; the rates of tuition were adjusted with a view to make the school self-sustaining; a majority of the pupils paid full rates, a small number half rates, and a still smaller number nothing. It was held to be a purely public charity, because its revenues only made it self-supporting, but it was distinctly intimated that if the revenues had gone beyond the line of self-support it would not have been exempt." The same doctrine was emphatically reasserted in White v. Smith, 189 Pa. 232, and applied by this court in Harrisburg v. Harrisburg Academy, 26 Pa. Superior Ct. 252. We have endeavored to show that the contention of appellant's counsel, thus far considered, is opposed to the doctrine of the adjudicated cases. Even if the question had not been authoritatively decided, the court below has made it clear, that if a surplus over cost of maintenance is derived from payments made by students, the institution can not be said to be maintained by public or private charity, even though the surplus be used to enlarge the institution by the purchase of additional lands and the erection of additional buildings—particularly if it be not shown that without such enlargement the institution could not be maintained.

The court found as a fact that the rental value "of the entire property" is such that if it be added to the expense of maintaining the college, the total would more than wipe out the clearings of any year, but concluded as matter of law that in determining whether there was a surplus over the cost of maintenance the rental value should not be included in the latter. It appears that the entire property of the corporation includes land and buildings not now in use as part of the college, from which an income is derived by renting part of it, and by cultivation of another part as a truck patch. See fourth and fifth findings of fact. Surely it cannot be contended that in determining the question now under consideration the rental value, i. e.,

the value of the use of that property for any purpose to which it is adapted, is to be added to other expenditures. But, assuming for the purpose of this case, that the court in finding as above as to the rental value of the "entire property" did not intend to include the property of which we have just spoken, we still think he was right in his legal conclusion. To conclude otherwise we would be driven to holding that the point of self-support from income derived from students is not passed until such income alone is larger than is needed, not only to pay all the expenses of conducting the charity, but also to put into the treasury of the corporation a sum equivalent to what could be derived by renting the lands and buildings for any purpose to which they are adaptable. This would be little different in principle from saying that a charity is not self-sustaining, until the income derived from those who enjoy its benefits is sufficient to pay the expenses of conducting it, and to give to the corporation a fair return upon the capital invested in its foundation and endowment. Either proposition would be a distinct and unwarranted advance beyond the doctrine of any of the cases above cited, and neither is sustained by the decision, interpreted in the light of the facts of the case, in Philadelphia v. Pennsylvania Hospital, 154 Pa. 9. We will not prolong this discussion. The learned judge below has treated this subject adequately and, to our minds, convincingly. So far as this question is concerned we rest our judgment upon his opinions without attempt on our part to further elucidate the subject.

In view of the foregoing conclusions, it is not necessary to decide or discuss the question of jurisdiction raised by appellees' counsel.

The decree is affirmed at the costs of the appellant.