**CHURCH OF THE OVERCOMER**

v.

**DELAWARE COUNTY BOARD OF AS-
SESSMENT APPEALS PREMISES:
1010 SUNSET STREET, TRAINER
BOROUGH FOLIO NO. 46–00–00563–
00.**

**Appeal of: Chichester School District.**

Commonwealth Court of Pennsylvania.

Argued Oct. 13, 2010.
Decided March 17, 2011.

Patrick T. Henigan, Media, for appellant.

Frances M. Minnis, Chester, for appellee.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge McCULLOUGH.

Chichester School District (District) appeals from the February 5, 2010, order of the Court of Common Pleas of Delaware County (trial court) overruling the decision of the Delaware County Board of Assessment Appeals (Board) and deeming property owned by the Church of the Overcomer (Church) at 1010 Sunset Street in the Borough of Trainer to be exempt from real estate taxation.

The Church was incorporated as a non-profit corporation with the Pennsylvania Department of State on August 7, 2000. The Church maintains a religious exemption from sales and use tax by the Commonwealth and has been granted federal tax exempt status by the Internal Revenue Service. On December 17, 2004, the Church acquired the property located at 1010 Sunset Street. The property has been subdivided into two tax parcels, each occupied by a building. One of these buildings is used for religious worship, and this parcel is exempt from real estate taxation. The other building is what the Church refers to as its "community center" and serves many different purposes. The first floor of the building consists of a large meeting room, a smaller room, and a kitchen. The second floor consists of four bedrooms; one has been converted to a library/classroom, another is used for storage, and the remaining two are reserved for use by visiting missionaries. The par-

cel containing the community center was not previously exempt.

However, in 2008, the Church filed an appeal of its 2009 real estate assessment with the Board seeking an exemption from real estate taxes for this parcel effective January 1, 2009. By order dated November 15, 2008, the Board denied the Church's appeal. The Church then filed a notice of tax assessment appeal with the trial court seeking an exemption as a duly recognized church under section 204(a)(1) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204(a)(1). The District filed a notice of intervention seeking to uphold the Board's exemption denial. At a hearing on December 21, 2009, the Church requested and was granted permission, over the District's objection, to amend its notice of appeal to seek an exemption as a purely public charity under section 204(a)(9) of the Assessment Law, 72 P.S. § 5020–204(a)(9).

Keith Collins, pastor and founder of the Church, was the only witness to testify at this hearing. Pastor Collins described the Church's philosophy as a commitment to helping people actualize their potential and overcome adversity, especially individuals who would not traditionally go to a church. Pastor Collins stated that, in addition to conducting religious services, the Church has implemented several programs to further its philosophy, including: a program to help children of incarcerated individuals; a program to help such individuals maintain family contact and prepare for release; a summer camp program; a food bank; an addictions ministry program; a youth ministry program; and a cyber school.

Pastor Collins noted that all of these programs are administered from the community center building and are open to the public, although events related to several of the programs actually take place in the church building. Pastor Collins explained that the community center programs are funded entirely by congregation donations and do not generate revenue or profit. On cross-examination, Pastor Collins acknowledged that some community center uses are related to worship, such as prayer meetings and Bible study, but he could not put a percentage on such uses. Nevertheless, Pastor Collins emphasized that the programs are open to anyone who desires to participate in them.

By order dated February 5, 2010, the trial court overruled the Board's decision and deemed the community center parcel exempt from taxation. The District appealed to this Court. The trial court thereafter issued an opinion indicating that the testimony of Pastor Collins established that the community center satisfied the necessary criteria to qualify for a tax exemption as a purely public charity. The trial court explained that: every use of the property advances a charitable program, all of which provide services to the community at large without charge; benefits are provided to a substantial and indefinite class of persons who are legitimate subjects of charity; the programs relieve the government of some of its burden; and the programs are conducted entirely free from private profit motive. Thus, the trial court concluded that the Church met the criteria for a purely public charity set forth by our Supreme Court in *Hospital Utilization Project v. Commonwealth of Pennsylvania*, 507 Pa. 1, 487 A.2d 1306 (1985) (hereafter *HUP* ).

On appeal to this Court,[1] the District first argues that the trial court erred

---

1. In a tax assessment appeal, our scope of     review is limited to determining whether the

in failing to analyze the Church and its community center as a single entity for real estate tax exemption purposes. We disagree.

Relying heavily on this Court's previous decisions in *In re Order of St. Paul the First Hermit*, 873 A.2d 31 (Pa.Cmwlth. 2005), *appeal denied*, 591 Pa. 707, 918 A.2d 749 (2007), and *St. Aloysius R.C. Church v. Fayette County Board of Assessment Appeals*, 849 A.2d 293 (Pa.Cmwlth.2004), the District contends that a single property which contains a church and supporting facilities must be analyzed as a single entity. However, the District misconstrues our holding in both *St. Paul* and *St. Aloysius*. Moreover, these cases are factually distinguishable from the present matter.

In *St. Paul*, the Order of St. Paul the First Hermit (Order) was the owner of eleven parcels of property and sought an exemption for a single parcel which included the Shrine of Our Lady of Czestochowa (Shrine),[2] a visitor's center, and a retreat house. The Order sought tax exemptions for the visitor's center and retreat house in their entirety as places of regularly stated religious worship, or, alternatively, as institutions of purely public charity. The trial court held that only certain portions of each building were exempt, i.e., those portions that were essential to the primary religious undertaking of the Shrine,[3] and

rejected the Order's purely public charity argument. This Court affirmed, noting that the Order had been seeking an exemption for the entire parcel as either a place of regularly stated religious worship or as an institution of purely public charity, that the property was primarily used for the former, and that the Order never sought individual tax exemptions for the visitor's center and retreat house as separate institutions of purely public charity operating independently of the Shrine itself.

In *St. Aloysius*, local taxing authorities, including the Fayette County Board of Assessment Appeals, concluded that the entire parish house of St. Aloysius Roman Catholic Church was taxable. The parish house consisted of two levels, with the lower level serving as a church office used for routine church business and the upper level serving as living quarters for the church's priest, support staff and visiting priests and missionaries. The trial court held that the lower level of the parish house was exempt because it was primarily used for public charity, but that the upper level was not exempt. This Court affirmed, noting that the church was not operating the parish house as an entity independent from the church itself. In both *St. Paul* and *St. Aloysius*, the determinative factor was the lack of any institu-

---

trial court abused its discretion or committed an error of law or whether its decision is supported by substantial evidence. *Lyons v. City of Philadelphia Board of Revision of Taxes*, 828 A.2d 485 (Pa.Cmwlth.2003). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383 (1985). A property owner's entitlement to a tax exemption is a mixed question of fact and law, and absent an abuse of discretion or a lack of supporting evidence, this court will not disturb the trial court's decision. *Lyons*.

2. This Shrine is dedicated to the patron saint of Poland and is revered by Polish Catholics and Catholics of many other nationalities, attracting over 400,000 visitors annually.

3. Specifically, the trial court held that cemetery offices, religious education classrooms and a chapel at the visitor's center were exempt, whereas a museum, gift shop, cafeteria, and delicatessen were not. At the retreat house, the trial court held that two chapels, a reference library, confessional rooms and the sacristy were exempt, whereas sleeping quarters and a meeting room were not exempt.

tion or entity acting independently of the underlying place of regularly stated religious worship.

In contrast to the facts in *St. Paul* and *St. Aloysius,* the evidence of record in this case reveals that the community center operated independently of the Church. More specifically, Pastor Collins testified that the community center operates at least seven different programs out of the facility, all of which serve different populations within the general public, and that participation is not limited to the Church's congregation. While Pastor Collins acknowledged that these programs are intended to further the Church's philosophy, he stressed that the headquarters of each of the programs is in the community center building and that the programs are open to the public. In addition, the property in question had been divided into two tax parcels, one containing the Church and the other containing the community center. The Church parcel was previously declared exempt and the Church was seeking a separate exemption for the parcel containing the community center. Thus, we conclude that the trial court did not err in declining to analyze the Church as a single entity for real estate tax exemption purposes.

■ Next, the District argues that the trial court abused its discretion in permitting the Church to amend its petition to seek an exemption as a purely public charity, rather than as a place of regularly stated religious worship, on the day of trial. We disagree.

The Pennsylvania Rules of Civil Procedure permit a party to amend a pleading at any time, either consensually or with leave of court. Pa. R.C.P. No. 1033. Specifically, Pa. R.C.P. No. 1033 provides as follows:

A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, correct the name of a party or amend the pleading. The amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense. An amendment may be made to conform the pleading to the evidence offered or admitted.

While counsel for the District initially objected to this amendment, counsel acknowledged that the testimony regarding the basis for exemption would essentially be similar under either exemption and merely requested the opportunity to brief the issue, which the trial court granted. Moreover, the District did not present any witnesses before the trial court, but relied entirely on its cross-examination of Pastor Collins. Our review of the hearing transcript does not reveal any prejudice to the District as a result of the amendment. Thus, we conclude that the trial court did not abuse its discretion in permitting the Church to amend its petition.

Finally, the District argues that the trial court erred as a matter of law in concluding that the Church was entitled to a tax exemption as a place of purely public charity because that conclusion is not supported by substantial evidence of record. We are constrained to agree with the District in this regard.

Article VIII, section 2 of the Pennsylvania Constitution permits the General Assembly by law to exempt certain places from taxation. Specifically, Article VIII, section 2(a)(i) permits exemption for "[a]ctual places of regularly stated religious worship" and section 2(a)(v) permits exemption for "[i]nstitutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actu-

ally and regularly used for the purposes of the institution." In accordance with that authority, the General Assembly enacted section 204 of the Assessment Law, which in relevant part provides that the following property shall be exempt from all county, city, borough, town, township, road, poor and school tax:

> (9) All real property owned by one or more institutions of purely public charity, used and occupied partly by such owner or owners and partly by other institutions of purely public charity, and necessary for the occupancy and enjoyment of such institutions so using it. . . .

72 P.S. § 5020–204(a)(9).

An institution seeking a real estate tax exemption bears a heavy burden of establishing its right to such an exemption. *Menno Haven, Inc. v. Franklin County Board of Assessment*, 919 A.2d 333 (Pa. Cmwlth.), *appeal denied*, 596 Pa. 711, 940 A.2d 367 (2007) (nursing home with a population that was twenty-five to twenty-eight percent eligible for Medicaid, that charged a substantial entrance fee, and catered to well-to-do elderly and others already within their community did not donate or gratuitously provide a substantial portion of its services and did not benefit a substantial and indefinite class of persons who were legitimate objects of charity). The test to determine what constitutes a purely public charity was originally set forth by the Pennsylvania Supreme Court in *HUP*.

*HUP* involved an appeal filed by the Hospital Utilization Project (HUP) from an order of this Court affirming an order of the Board of Finance and Revenue denying HUP's application for tax-exempt status. HUP was created in 1963 as a joint project funded by the Hospital Council of Western Pennsylvania, with contributions from the Allegheny County Medical Society Foundation and thirty-three pri-

vate and corporate foundations. The purpose of HUP was to provide statistical analyses of patient treatment and cost data and offers these analyses to hospitals and other health care providers to assist in their efforts to maintain efficiency and ultimately reduce health care costs.

The Department of Revenue granted HUP tax-exempt status in 1965 and permitted HUP to use the tax-exemption numbers of the Hospital Council or the Medical Society Foundation. The Hospital Council withdrew from the project in 1967 and HUP was thereafter funded through direct payments from individual hospitals. Following an internal review in 1980, the Department of Revenue directed HUP to apply for its own tax-exemption number. HUP applied for an exemption as a charitable organization and an institution of purely public charity, but its application was denied. This denial was affirmed by the Department of Revenue's Board of Appeals, the Board of Finance and Revenue, this Court, and, ultimately, our Supreme Court. The Supreme Court held that HUP was not a purely public charity under state constitutional law because it did not offer free services or use all of its profit for charitable purposes. The Court described HUP's funding from 1967 to the date of its decision as a fee-for-services arrangement.

The Court in *HUP* held that, in order to qualify as a purely public charity, an entity must possess the following characteristics:

1. Advances a charitable purpose;

2. Donates or renders gratuitously a substantial portion of its services;

3. Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

4. Relieves the government of some of its burden; and

5. Operates entirely free from profit motive.

*HUP,* 507 Pa. at 22, 487 A.2d at 1317. By satisfying the *HUP* test, an entity demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. However, the entity must then prove that it satisfies the statutory qualifications for an exemption found in section 5 of the Institutions of Purely Public Charity Act (Charity Act), Act of November 26, 1997, P.L. 508, *as amended,* 10 P.S. § 375. *Community Options v. Board of Property Assessment,* 571 Pa. 672, 813 A.2d 680 (2002). The Charity Act codifies the *HUP* requirements and defines the same, setting forth specific elements that must be met to satisfy each requirement.[4] *Pottstown School District v. Hill School,* 786 A.2d 312 (Pa.Cmwlth.2001).

■ The District argues that the evidence presented by the Church fails to satisfy the Charity Act's requirements relating to community service, charity to persons, and government service found in sections 5(d), (e), and (f), 10 P.S. § 375(d)-(f). The community service requirement expands upon the second element of the *HUP* test, i.e., the requirement that the institution must donate or render gratuitously a substantial portion of its services. Section 5(d)(1) of the Charity Act provides that this criterion is satisfied if the institution benefits the community by actually providing *any* of the following:

(i) Goods or services to all who seek them without regard to their ability to pay for what they receive if all of the following apply:

(A) The institution has a written policy to this effect.

(B) The institution has published this policy in a reasonable manner.

(C) The institution provides uncompensated goods or services at least equal to 75% of the institution's net operating income but not less than 3% of the institution's total operating expenses.

(ii) Goods or services for fees that are based upon the recipient's ability to pay for them *if all of the following apply:*

(A) The institution can demonstrate that it has implemented a written policy and a written schedule of fees based on individual or family income. An institution will meet the requirement of this clause if the institution consistently applies a formula to all individuals requesting consideration of reduced fees which is in part based on individual or family income.

(B) At least 20% of the individuals receiving goods or services from the institution pay no fee or a fee which is lower than the cost of the goods or services provided by the institution.

(C) At least 10% of the individuals receiving goods or services from the institution receive a reduction in fees of at least 10% of the cost of the goods or services provided to them.

(D) No individuals receiving goods or services from the institution pay a fee which is equal to or greater than the cost of the goods or services provided to them, or the goods or services provided to the individuals described in clause (B) are comparable in quality and quantity to the goods or services provided to those individuals who pay a fee which is equal to or greater than the cost of the goods or services provided to them.

---

**4.** We note that the *HUP* test and the Charity Act are not mutually exclusive and operate concurrently, with the Charity Act codifying the purely public charity test of *HUP* and expounding upon the requirements thereof. *St. Aloysius; Pottstown School District.*

(iii) Wholly gratuitous goods or services to at least 5% of those receiving similar goods or services from the institution.

(iv) Financial assistance or uncompensated goods or services to at least 20% of those receiving similar goods or services from the institution if at least 10% of the individuals receiving goods or services from the institution either paid no fees or fees which were 90% or less of the cost of the goods or services provided to them, after consideration of any financial assistance provided to them by the institution.

(v) Uncompensated goods or services which in the aggregate are equal to at least 5% of the institution's costs of providing goods or services.

(vi) Goods or services at no fee or reduced fees to government agencies or goods or services to individuals eligible for government programs . . .

(vii) Fundraising on behalf of or grants to an institution of purely public charity, an entity similarly recognized by another state or foreign jurisdiction, a qualifying religious organization or a government agency and actual contribution of a substantial portion of the funds raised or contributions received to an institution of purely public charity, an entity similarly recognized by another state or foreign jurisdiction, a qualifying religious organization or a government agency.

10 P.S. § 375(d)(1)(i)-(vii).

Pastor Collins was the only witness to testify at the hearing before the trial court. He stated that all of the programs offered at the community center were free and open to the public and to anyone who desires to participate in them. Pastor Collins also testified that the programs are funded solely by fundraising and donations from the congregation and that the Church operates on an annual budget well under $100,000.00. However, Pastor Collins could not cite a written policy relating to the community center's programs, and he offered no specific testimony as to the different percentages detailed above. While Pastor Collins noted that the Church does publish a brochure in house describing its philosophy and the programs it offers, the brochure merely states the names of the programs and does not specify that the programs are administered, offered, or located at the community center. Moreover, Pastor Collins did not testify how the brochure is disseminated. Similarly, Pastor Collins did not testify that the community center provides goods or services to government agencies or that it engages in fundraising on behalf of other institutions of purely public charity. Thus, we are constrained to conclude that the evidence presented on behalf of the Church was insufficient to meet this requirement.

■ We next address the requirement of section 5(e) of the Charity Act, concerning charity to persons. This requirement expands upon the third element of the *HUP* test, providing that "[t]he institution must benefit a substantial and indefinite class of persons who are legitimate subjects of charity." Section 5(e)(1) of the Charity Act, 10 P.S. § 375(e)(1). Section 5(e)(2) defines "[l]egitimate subjects of charity" as "[t]hose individuals who are unable to provide themselves with what the institution provides for them." 10 P.S. § 375(e)(2). This section further defines "[s]ubstantial and indefinite class of persons" as "[p]ersons not pre-determined in number. . . ." *Id.* In *Appeal of Sewickley Valley YMCA*, 774 A.2d 1 (Pa.Cmwlth. 2001), this Court indicated that, in order to meet this criterion, an entity must show that it makes a bona fide effort to service those persons who are unable to afford the usual fee or for whom the fee is outside of their financial reach. The persons need

not be in financial distress, but it must be shown that the services are provided to persons who cannot afford to pay. *Id.*

Pastor Collins testified that the community center's programs are utilized by individuals in the general locale, both inside and outside of Delaware County, but he did not offer any specific testimony regarding the nature of these individuals or whether said individuals are able to provide for themselves. Thus, the evidence presented on behalf of the Church also was insufficient to meet this requirement.

The government service requirement, set forth in section 5(f) of the Charity Act, expands upon the fourth element of the *HUP* test, i.e., providing that the institution must relieve the government of some of its burden. Section 5(f) states that this criterion is satisfied if the institution meets *any* one of the following:

(1) Provides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service.

(2) Provides services in furtherance of its charitable purpose which are either the responsibility of the government by law or which historically have been assumed or offered or funded by the government.

(3) Receives on a regular basis payments for services rendered under a government program if the payments are less than the full costs incurred by the institution, as determined by generally accepted accounting principles.

(4) Provides a service to the public which directly or indirectly reduces dependence on government programs or relieves or lessens the burden borne by government for the advancement of social, moral, educational or physical objectives.

(5) Advances or promotes religion and is owned and operated by a corporation or other entity as a religious ministry and otherwise satisfies the criteria set forth in section 5.

(6) Has a voluntary agreement under section 7.

10 P.S. § 375(f)(1)-(6). This Court has previously found that an abandoned school converted by a church into a job center, addiction center, and food bank as well as a rehabilitation center that targets addictions and attempts to rehabilitate prisoners to reduce the rate of recidivism qualify as purely public charities under the Charity Act. *See Borough of Homestead v. St. Mary Magdalen Church,* 798 A.2d 823 (Pa. Cmwlth.2002); *Gateway Rehabilitation Center, Inc. v. Board of Commissioners of the County of Beaver,* 710 A.2d 1239 (Pa. Cmwlth.1998). In each of these cases, this Court recognized that the services provided by the respective charities were the types of services historically provided/funded by the government.

■ Pastor Collins testified about the various programs offered at the community center, including: the Angel tree program, which ensures that children of incarcerated individuals receive Christmas gifts; the Prison to Praise program, which assists families in maintaining contact with incarcerated family members so as to provide an easier transition back into the community upon release; a Free Indeed program, which assists people with all types of addiction programs; a cyber school, which targets at-risk students and students with learning or behavioral problems; and a food bank, which offers a free breakfast and lunch program during the summer. (R.R. at 58a–68a, 110a–112a.) This Court recognizes that the programs provided by the Church to treat addiction, provide education, reduce recidivism rates and assist with reform, and provide food to

those in need are the types of services historically assumed or funded by government. Accordingly, this testimony from Pastor Collins was sufficient to meet the requirements of section 5(f)(2).

Nevertheless, while the Church should be commended for the variety of noteworthy programs it offers to the public, and although the requirements of section 5(f)(2) of the Act were met, the evidence was not sufficient to meet all of the requirements mandated by the Charity Act.[5] Accordingly, we are constrained to reverse the order of the trial court.

## ORDER

AND NOW, this 17th day of March, 2011, the February 5, 2010, order of the Court of Common Pleas of Delaware County is hereby reversed.

---

5. This opinion does not preclude the Church from applying for such exemption from real estate taxation in future years.